**SIGNED THIS: February 27, 2007**

```
                                    _____
                                         THOMAS L. PERKINS
                                    UNITED STATES CHIEF BANKRUPTCY JUDGE
```
___

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| FREDERICK G. MURPHY, JR., | ) | |
| d/b/a Murphy Container Service and | ) | No. 04-85182 |
| Recycling, and GWEN A. MURPHY | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |
| BRUCE E. BEHNKE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 05-8030 |
| | ) | |
| FREDERICK G. MURPHY, JR., | ) | |
| d/b/a Murphy Container Service and | ) | |
| Recycling, and GWEN A. MURPHY | ) | |
| Defendants. | ) | |

**O P I N I O N**

This matter is before the Court for decision after trial on Count III of the Complaint filed by the Plaintiff, Bruce Behnke, against the Debtors, Fredrick Glenn Murphy, Jr. and Gwen Antionette Murphy (collectively referred to as "DEBTORS" and individually

referred to as "FRED JR" and "GWEN"), seeking denial of the DEBTORS' discharge pursuant to Section 727(a)(4)(A), alleging that they knowingly and fraudulently made false oaths in connection with their Chapter 7 case.

**FACTUAL BACKGROUND**

In the year following the DEBTORS' marriage in 1979, FRED JR became employed in the family business, which was engaged in refuse collection, rental of containers and recycling. At that time, the business was operated as a partnership among his father, Fred Murphy, Sr. (FRED SR) and his brothers. GWEN began working as a bookkeeper for the business in the mid-80's. The business was incorporated in 1990 with stock being owned by FRED SR, FRED JR and GWEN. The DEBTORS and FRED SR entered into an agreement dated July 12, 1991, pursuant to which FRED SR sold his stock to the DEBTORS for $100,000, payable at the rate of $500 per week. FRED SR continued to drive a truck for the business until 2000, when he had cardiac surgery. When he returned, he ran errands and maintained a supervisory role, but by 2001 or 2002, his health further declined and he was no longer able to work full time.

The business encountered financial difficulties in 2003 and 2004 and the DEBTORS ceased wage withholdings for their employees. After the corporation was dissolved in 2003, FRED JR and GWEN operated the business as an unincorporated enterprise. Though the DEBTORS missed making payments to FRED SR during times of financial hardship, he was paid in full by July, 2004. Payments under the contract were not always made directly to FRED SR. At times, the DEBTORS would pay his utility, telephone or medical

2

bills. Within the year immediately preceding the bankruptcy, FRED SR was paid a total of $24,000.

The PLAINTIFF, one of the DEBTORS' employees, was seriously injured in a work-related accident on June 14, 2002. At the time of the injury, the DEBTORS did not maintain workers compensation insurance. In September, 2003, the Illinois Industrial Commission awarded the PLAINTIFF $26,592.60 in medical expenses; $12,319.86 in temporary total disability; $90,684 in partial permanent disability; $19,456.03 and $2,500 in penalties for delay in payment of benefits; and $2,807.83 in attorney fees and costs. A judgment by default against the DEBTORS was entered by the state court in March, 2004, awarding the PLAINTIFF $75,513.72.[1]

On November 19, 2004, the same day that GWEN'S deposition was set in a citation proceeding brought by the PLAINTIFF, the DEBTORS filed a bankruptcy petition under Chapter 7. Neither the matrix nor the schedules were filed with the petition, but were filed on December 14, 2004, after obtaining an extension from the Court. The DEBTORS had not filed income tax returns for five years and maintained no books or records other than a check register. On the advice of their attorney, the DEBTORS hired an accountant in November, 2004, but the income tax returns were not completed until the spring of 2006. The first meeting of creditors and the examination of the DEBTORS under oath by the Chapter 7 Trustee was held on January 18, 2005.[2]

---

[1] The judgment provided that in addition to that amount, in accordance with the Arbitrator's decision, the PLAINTIFF was awarded judgment for future payments in the amount of $79,147.20, payable at $264 per week.

[2] The Chapter 7 trustee, who is statutorily charged with administering the bankruptcy estate, has not filed an objection to the DEBTORS' discharge. Although the Chapter 7 trustee originally kept the case pending based on representations by the PLAINTIFF that the DEBTORS had failed to disclose all their assets, he recently filed a no asset report.

3

The PLAINTIFF brought this adversary proceeding seeking a determination that his debt was nondischargeable under Section 523(a)(6) and objecting to the DEBTORS' discharge. By Order entered April 14, 2005, Counts I and II of the Complaint, directed at determining the dischargeability of the debt as a willful and malicious injury, were dismissed. Count III, premised on Section 727(a)(4)(A) of the Bankruptcy Code, was tried by the Court on November 9 and December 19, 2006.

**TESTIMONY AND EVIDENCE ADDUCED AT TRIAL**

GWEN testified that she considers the business to be a partnership between she and FRED JR and that she was in charge of the financial aspects of the business. Prior to employing an accountant after the petition was filed, she did not maintain a general ledger. She admitted that she did not do a very good job and that the only records of the business transactions were the check registers and bank statements. She testified that she never really knew how the business was doing on a day to day or month to month basis. When a bill needed to be paid, she would check the account balance to determine if the funds were available. GWEN did, however, maintain a computer record of accounts receivable which would enable her to print statements and to post payments. The only other employees at the time of the filing were their two sons.

GWEN testified that although, by its terms, the buy-out agreement was due to be paid off in 1995, no payments were made when the business encountered financial difficulties. She originally considered the contract payments to FRED SR to be wages, but was advised by the accountant that such characterization was incorrect.

4

GWEN testified that she had borrowed money from her mother on various dates which she kept track of on a piece of paper and that no promissory notes were ever executed. It was her understanding that Peoples National Bank had a lien on all of the business property. GWEN testified that the DEBTORS had kept several old vehicles with the hopes that someday they or their children would be in a position to restore them. She stated that neither the 1941 International, 1956 Packard, the 1962 Plymouth, or the 1966 Dodge Charger were operable and have only scrap value.

According to GWEN'S testimony, FRED JR played no role in the preparation of the bankruptcy worksheet. She stated that she did show it to him for his review and they went to their attorney's office to sign the petition together. GWEN did not recall telling her attorney's legal assistant that she did not have check registers, believing instead that she told her that she did not maintain general ledgers.

The testimony of FRED JR was very brief. He testified that he ran the operations of the business and was not involved in the financial aspects of the business or in the keeping of the books and records. Like GWEN, he considers them to be equal partners in the business. FRED JR testified that he did not individually read either the Statement of Affairs or the bankruptcy schedules, but that he was present at the attorney's office with GWEN when the schedules were being reviewed prior to being signed.

Dennis Jensen, a paralegal employed by the same law firm as PLAINTIFF'S attorney, experienced in real estate and income tax work, testified on behalf of the PLAINTIFF. His search disclosed that Tracts 2 - 6 and 8 were subject to a mortgage dated October 6, 2000, in the amount of $97,875.31. Tract 9 was subject to a mortgage dated

5

February 14, 1998, for $16,000. The DEBTORS' residence, identified on Schedule A as Tract 1, is subject to a mortgage dated October 10, 2000, for $65,217. Tract 7 was unencumbered. Jensen also reviewed the DEBTORS' bank statements, ledgers, check registers, and deposit slips.

Karen Cooke, a Certified Public Accountant retained by the DEBTORS soon after the petition was filed, prepared general ledgers for the years 2002 through 2005 and income tax returns for 2001 through 2005. She testified that her only contact was with GWEN and that the only records she received from the DEBTORS were check registers and bank statements. Ms. Cooke regarded the information as accurate, based upon a reconciliation of those documents. When she learned of the DEBTORS' purchase of the business, she reclassified the payments made to FRED SR from wages to loan repayments. Because she did not know the balance due on the contract or have a copy of the buy-out agreement or the amortization schedule, she allocated the payments to a draw account, without distinguishing between payments to principal or payments to interest. She admitted that no W-2's were issued to GWEN and that the tax returns which she prepared do not show any wages being received by her. The general ledgers and the returns were not completed until May, 2006, due to both the delay in getting records from GWEN and the constraints of her accounting practice.

Jennifer Algeier, a legal assistant employed by the law firm who represented the DEBTORS in connection with their bankruptcy, testified that the petition was filed on an emergency basis on November 19, 2004, at 8:30 a.m., due to the impending state court hearing. Ms. Algeier testified that GWEN filled out a standard bankruptcy worksheet

which she used in order to prepare the bankruptcy petition. She testified that GWEN told her that there were no check registers. As completed by GWEN, the worksheet reflects that the DEBTORS had made no gifts to family members during the past year, had not transferred any property worth $600 or more to creditors during that same time, nor had they submitted a financial statement to a financial or credit institution during the past two years. The worksheet inquiry regarding payments to creditors within the preceding ninety days was left blank. The DEBTORS did disclose their involvement in the business on the worksheet.

In preparing Schedule A, Ms. Algeier relied on the real estate appraisal of the business property prepared by Dan Hier in July, 2002, and on the real estate tax assessment for the residence. She explained that the software program used by the law firm automatically links Schedule A and Schedule D and in order to show the secured creditor as having a lien on both real estate and equipment, the mortgage was listed on Schedule D with a combined collateral value of $103,000. Based on information obtained from GWEN, she believed that all of the real estate was encumbered.

Ms. Algeier treated the DEBTORS' business as a sole proprietorship. Acknowledging that the DEBTORS affirmatively disclosed in the worksheet that they had been involved in a business or partnership during the last two years, she testified that she did not separately list the business in the statement of affairs because she considered their personal and business expenses to be combined.[3]

---

[3] At the close of the first trial day, the Court took under advisement the PLAINTIFF'S oral motion to compel production of the client file maintained by the DEBTORS' attorney. Prior to the resumption of the trial on November 19, 2006, the Court granted the motion, ruling that the file was to be produced in its entirety, unless the DEBTORS asserted specific claims of privilege. The portion of the file which was used by the DEBTORS' law firm in the preparation of the schedules was produced and introduced into evidence at the second day of trial.

The PLAINTIFF testified that he has been totally disabled since his accident. He also testified that FRED SR was at the business daily, working up until 2003.

**ANALYSIS**

A discharge in bankruptcy is not a fundamental right extended to all, but a privilege which is only granted to the honest debtor. *Matter of Yonikus*, 974 F.2d 901 (7th Cir. 1992). Section 727(a)(4) of the Bankruptcy Code provides that a court will not discharge a debt if "the debtor knowingly and fraudulently, in or in connection with the case made a false oath or account." 11 U.S.C. § 727(a)(4)(A). The purpose underlying this provision is to insure that adequate information is available to those interested in the administration of the bankruptcy estate without having to conduct further examinations or investigations to determine whether the provided information is true. *In re Tauber*, 349 B.R. 540 (Bankr.N.D. Ind. 2006). Voluntary, truthful disclosure by the debtor is essential to the successful administration of the bankruptcy system. *In re Huff*, 349 B.R. 587 (Bankr.S.D.Iowa 2006).

In order to prevail under this provision, a plaintiff must establish (1) that the debtor made a statement under oath, (2) that such statement was false, (3) that the debtor knew the statement was false, (4) that the debtor made the statement with fraudulent intent, and (5) that the statement related materially to the bankruptcy case. *Matter of Agnew*, 818 F.2d 1284 (7th Cir. 1987); *In re Petersen*, 296 B.R. 766, 790 (Bankr.C.D.Ill. 2003). A false statement on a debtor's schedules or statement of financial affairs constitutes a false oath. *In re Senese*, 245 B.R. 565 (Bankr.N.D.Ill. 2000). The intent to defraud must be actual and not constructive. *Matter of Krehl*, 86 F.3d 737 (7th Cir. 1996). Because a debtor's admission of fraud is most unlikely, the requisite intent may be inferred from circumstantial evidence or by inference based on a course of conduct. *Village of San Jose v.*

8

*McWilliams*, 284 F.3d 785 (7th Cir. 2002). Reckless disregard for the truth is treated as the equivalent of fraud for purposes of Section 727(a)(4)(A). *Yonikus*, 974 F.2d at 905. A discharge should not be denied, however, where the falsehood was the result of mistake or inadvertence. *In re Von Behren*, 314 B.R. 169 (Bankr.C.D.Ill. 2004). A false statement will be deemed material for purposes of Section 727(a)(4)(A) if it relates to the debtor's estate, discovery of assets, disposition of property or a debtor's entitlement to discharge. *In re Bailey*, 147 B.R. 157 (Bankr.N.D.Ill. 1992).

The PLAINTIFF contends that the DEBTORS made false oaths on the Statement of Financial Affairs and in the bankruptcy schedules that require the denial of their discharge under Section 727(a)(4)(A). Specifically, the PLAINTIFF contends that the DEBTORS made the following false oaths or omissions.

**Statement of Financial Affairs**

**1. No. 3. Payments to creditors.** Question 3(a) requires the debtor to list all payments to creditors on loans, installment purchases of goods or services or other debts aggregating more than $600 to any one creditor, made within the ninety days preceding the bankruptcy. The DEBTORS indicated that they had made no such payments. They failed to report that they paid the Knox County Landfill, one of their major creditors, $4,234.29 on October 7 and $9,000 on October 14, 2004. GWEN testified that those payments, though on the eve of bankruptcy, were not unusual, and the general ledger for 2004 supports her testimony.[4]

---

[4] According to the general ledger, payments made to the Knox County Landfill during 2004 included the following: $10,000 on 1/14/04; $9,000 on 2/12/04; $9,000 on 3/11/04; $9,000 on 4/15/04; $9,000 on 5/15/04; $6,000 on 6/22/04; $3,000 on 6/30/04; $6,000 on 7/30/04; $6,000 on 9/01/04; and $4,000 on 9/09/04. In addition to the foregoing, other substantial payments were made to the same creditor each month.

Question 3(b) requires the debtor to disclose payments made to insiders within the year preceding the filing. The PLAINTIFF contends that the DEBTORS failed to disclose payments totaling $24,000 to FRED SR within the year preceding bankruptcy. GWEN testified that she did not consider the contract payments being made to FRED SR to fall within that category because she did not consider FRED SR to be a "creditor." She had been treating him as an employee.

**2. No. 7. Gifts.** This inquiry requires the debtor to disclose any gifts with an aggregate value of $200 or more within the year preceding bankruptcy. The PLAINTIFF contends that the DEBTORS failed to disclose two payments to their daughter in the amounts of $762 and $605.52 made on December 9, 2003. In addition, the PLAINTIFF contends that the DEBTORS failed to disclose a payment of $1,050 made to their daughter-in-law on October 4, 2004.

GWEN testified that she paid Black Hawk College $762 for her daughter's tuition. At that time, her daughter was eighteen years old and was living at home. The payment of $605.52 was for a bed purchased from Klavohn Furniture for the DEBTORS' spare bedroom which her daughter was picking up for them. GWEN testified that the payment of $1,050 was made to their daughter-in-law because she was making a payment for GWEN on GWEN'S behalf when she was unable to get to the bank.

**3. No. 18. Nature, location and name of business.** This question requires the debtor to indicate, if the debtor is an individual, the names and addresses of all businesses in which the debtor was an officer, director, partner or managing executive of a corporation, partnership, sole proprietorship or was a self-employed professional within the two years immediately preceding the commencement of the case. "None." DEBTORS failed to

10

provide the information requested, including their roles as officers or partners and the dates of the beginning and ending of their interest and its value.

Although the DEBTORS indicated "none" in response to an inquiry as to their interest in any partnership or self proprietorship in the Statement of Affairs, the DEBTORS disclosed the following amounts as income from employment or operation of business under the first question on the Statement of Affairs:

| AMOUNT | SOURCE |
| --- | --- |
| $37,000.00 | 2004 Murphy Container Service and Recycling (husband) - estimated |
| $11,700.00 | 2004 Murphy Container Service and Recycling (wife) - estimated |
| $39,000.00 | 2003 Murphy Container Service and Recycling (husband) - estimated |
| $12,000.00 | 2003 Murphy Container Service and Recycling (wife) - estimated |
| $39,000.00 | 2002 Murphy Container Service and Recycling (husband) - estimated |
| $12,000.00 | 2002 Murphy Container Service and Recycling (wife) - estimated |

In addition, the first page of the petition discloses that the DEBTORS were doing business as Murphy Container Service and Recycling. Schedule B of the petition listed accounts receivable owing of $27,901.90, as well as other business equipment. While the failure to disclose the business as a sole proprietorship or partnership on the Statement of Affairs was an error, this Court concludes that it was inadvertent. Moreover, it was neither misleading nor unclear. Most of the information that the PLAINTIFF contends should have been disclosed by the DEBTORS was in fact disclosed, although in another part of the bankruptcy petition.

**4. No. 19. Books, records and financial statements.** Under subparagraph a, DEBTORS failed to disclose GWEN as a bookkeeper. Under subparagraph d, DEBTORS failed to disclose that they gave a financial statement to Peoples National Bank within the two years prior to the bankruptcy.

While GWEN admitted that she kept the records for the business, she testified that she did not consider herself to be a "bookkeeper."

**5. No. 21. Current Partners, Officers, Directors and Shareholders.** Question 5(a) requires a partnership debtor to list the nature and percentage of partnership interest of each member of the partnership. The DEBTORS' response to this question was "None." Relying on GWEN'S testimony that she and her husband consider themselves to be partners, the PLAINTIFF contends that the DEBTORS' response is false. The Court does not consider the DEBTORS' failure to disclose their informal "mom and pop" partnership in response to this question to be a false oath. The Murphy Container business is more accurately characterized as a sole proprietorship.

**Schedules**

1. Schedule A requires the debtor to describe and locate real property in which the debtor has an interest and to indicate the current market value and the amount of any secured claim. The PLAINTIFF contends that the listing of the real estate and encumbrances on Schedule A was so vague and misleading as to make identification impossible without conducting a records search. The DEBTORS' Schedule A lists the value of their home, identified as Tract 1, at $60,000 and the amount of the secured claim at $66,875.81. Tracts 2 - 8 listed on Schedule A comprise the business property and were shown as having a value of $90,000 and not subject to a security interest. Tract 9, also shown as unencumbered, was listed as having a value of $5,000. The paralegal employed by the PLAINTIFF'S attorney testified that it was necessary for him to conduct a title search in order to determine which tracts of real estate were encumbered by a mortgage. He

determined that Tract 7 was owned free and clear by the DEBTORS and that Tract 9 was subject to a mortgage.

Undervaluation alone is seldom considered to be a false oath for purposes of Section 727(a)(4)(A) where the asset has been properly scheduled by the debtor. *In re* Scott, 233 B.R. 32 (Bankr.N.D.N.Y. 1998); *see also In re Zimmerman*, 320 B.R. 800 (Bankr.M.D.Pa. 2005). When an asset has been properly disclosed, the trustee and the creditors can make their own independent determination of its value. *In re Blum*, 41 B.R. 816 (Bankr.S.D.Fla. 1984). A debtor's opinion as to the value of an asset, based on estimates, cannot be expected to be right on the mark. *In re Poland*, 222 B.R. 374 (Bankr.M.D.Fla. 1998). Here, the DEBTORS' estimate of value has a reasonable basis. GWEN testified that she attributed a value of $60,000 to their residence, based on its assessed value for real estate tax purposes and the selling prices of the neighboring houses at $52,000 to $54,000 at the time of the bankruptcy. In support of his allegation that the DEBTORS undervalued their residence, the PLAINTIFF introduced an appraisal dated September, 2000, which attributed a value of $80,000 to the residence.[5] That appraisal, more than four years old at the time the petition was filed, is entitled to no weight at all.

Although Schedule A failed to show that the business property was subject to a mortgage, the DEBTORS' Schedule D disclosed that Peoples National Bank of Kewanee held a claim of $99,571.88, secured by real estate and equipment. As explained by Ms. Algeier, the mortgage against the business property was reported only on Schedule D to

---

[5] The DEBTORS stipulated to the admission of the appraisal, but claim that it is too far out of date to be relevant.

avoid a duplication which would have been triggered if the mortgage had been separately listed on Schedule A. While the DEBTORS may have been mistaken as to which parcel of real estate was unencumbered, they disclosed their ownership of the property and the existence and amount of the mortgage.

2. The PLAINTIFF contends that the DEBTORS grossly understated the values of personal property on Schedule B and omitted items of significant value.

**A. Understated the balance in bank accounts.** Line 1 on Schedule B requires a debtor to list the amount of any "cash on hand." Line 2 requires a debtor to list the amount of any bank or deposit accounts. The DEBTORS reported that they had $55 in cash on hand and a checking account at Peoples National Bank with a zero balance. GWEN testified that she opened two accounts on the date that the petition was filed, depositing $100 in each account. She testified that she had not held back any checks to deposit in the new accounts. According to the November bank statement for the business checking account, the balance on November 18, 2004, the day before the bankruptcy was filed, was a negative $23.59. On November 19, 2004, the balance of the account is shown as a negative $1,871.33.

Bank statements introduced by the PLAINTIFF for both the operating and the payroll accounts show an initial deposit of $100 in each account. The statement for the operating account shows a second deposit on that same day in the amount of $794.69. That deposit was made up of nine separate checks. The statement for the payroll account shows a second deposit having been made on the date the account was opened in the amount of $650.

14

Ms. Algeier testified that the bankruptcy petition was filed first thing in the morning on November 14, 2006, at 8:38 a.m. It is clear from the identifying numbers given the deposit slips by the bank that the second deposits were made at a later time.

**B. Attributed no value to the business.** GWEN testified that the value of the business has declined since its purchase in 1991. As previously noted, the DEBTORS disclosed the business assets, including the accounts receivable. The PLAINTIFF offered no evidence that the business, clearly insolvent, had an independent value.

3. The PLAINTIFF contends that the DEBTORS mischaracterized his claim as unsecured when he had obtained a lien against the DEBTORS' real estate by filing a memorandum of judgment. The PLAINTIFF offered no evidence that the DEBTORS were aware of that recording.

4. The PLAINTIFF questions the listing of GWEN'S mother on Schedule F as holding an unsecured claim in the amount of $28,000, because the DEBTORS did not sign a promissory note for the indebtedness. GWEN testified that she had borrowed various sums at different times and that she had kept a list of the amounts on a piece of paper. The PLAINTIFF was given a copy of a handwritten list of amounts and dates of the loans. GWEN denied that the transfers were gifts and not loans.

5. The PLAINTIFF contends that the DEBTORS inaccurately characterized the nature of FRED JR'S earnings on Schedule I as wages when in fact he was being paid a draw as an owner/operator of the business. The PLAINTIFF also contends that the DEBTORS improperly lumped together business and personal expenses on Schedule J. GWEN testified that she did not understand this distinction until it was explained by Ms.

Case 05-08030   Doc 61   Filed 02/27/07   Entered 02/27/07 13:45:35   Desc Main
                          Document      Page 16 of 17

Cooke, some time after the filing of the petition. GWEN testified that she had never prepared tax returns.

Acknowledging that none of the DEBTORS' false statements or omissions, when considered individually would result in a denial of the DEBTORS' discharge, the PLAINTIFF invokes the theory that an accumulation of falsehoods adds up to an intent to deceive. Many courts have recognized that fraudulent intent may be inferred from a pattern of multiple inaccuracies in a debtor's petition and bankruptcy schedules which evidence a reckless and cavalier disregard for the truth. *In re Guenther*, 333 B.R. 759 (Bankr.N.D.Tex. 2005); *In re Costello*, 299 B.R. 882 (Bankr.N.D.Ill. 2003); *In re Leffingwell*, 279 B.R. 328 (Bankr.M.D.Fla. 2002).

In the present case, the DEBTORS admit that the Schedules and Statement of Financial Affairs contain some false statements. They maintain, however, that despite the inaccuracy of certain responses to particular questions, the sought-after information is supplied elsewhere in the petition, and that overall they disclosed all of their assets and liabilities.[6]

Neither of the DEBTORS are financially sophisticated and the Court found the testimony of both DEBTORS to be forthright and candid. Undoubtedly, GWEN is a poor bookkeeper and she admitted as much. Most of the inaccuracies are attributable to the lack

---

[6] In closing argument, the DEBTORS' attorney represented that the aspects of the business were fully discussed at the first meeting of creditors. The transcript of that proceeding was not made a part of the record and that representation is disregarded by the Court. Notes taken by the DEBTORS' attorney at that meeting, reflect that mention was made of the DEBTORS' purchase of the business in 1990 or 1991 and the monthly payments of $575 to FRED SR, for five and one-half years for his interest in the business. Although those notes also reflect that FRED SR was paid off in 1995 or 1996, that notation may have been the result of the attorney's own calculation. The PLAINTIFF does not contend that the DEBTORS falsely answered any questions at the first meeting of creditors.

of complete business records, the absence of tax returns, and GWEN'S uncertainty about how to properly account for various expenditures. The Court believes that the errors and omissions were the result of oversight and inadvertence rather than fraudulent intent.[7] No assets were hidden and the Trustee's administration of the case was apparently not hindered by the errors.

Neither is the quantity or quality of the errors so significant as to give rise to an inference of fraudulent intent or reckless and cavalier disregard for the truth. Most of the inaccuracies relied upon by PLAINTIFF are technical, more in the nature of incorrect characterizations rather than wholesale omissions.

Moreover, the PLAINTIFF had already lost out on his attempt to have his debt determined nondischargeable. The claim to deny the DEBTORS their discharge was a secondary one. In the Court's view, this was a case where a disgruntled and particularly aggressive creditor flyspecked the DEBTORS' bankruptcy papers looking for every possible error, material or not.

This Court finds that the evidence, considered as a whole, establishes that none of the omissions or false statements, whether considered alone or in the aggregate, were knowingly and fraudulently made, or were made with such reckless disregard for the truth that fraudulent intent is clearly indicated. Judgment will be entered for the DEBTORS.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###

---

[7] Although most of the inaccuracies could have been avoided or corrected by a more thorough inquiry by the DEBTORS' bankruptcy lawyers and staff, for whatever reason, that didn't happen in this case.